UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

JACKSONVILLE DIVISION

**TROOPER DONNA JANE WATTS,**

    **Plaintiff,**

vs.                                          Case No. 3:15-cv-00756-BJD-MCR

**CITY OF JACKSONVILLE, FLORIDA,
PAMELA ABBOUD, AND
BRIJIN PEMBERTON,**

    **Defendants.**

_____/

## PLAINTIFF'S RESPONSE TO DEFENDANTS ABBOUD'S AND PEMBERTON'S MOTION TO DISMISS

Comes now Plaintiff, Trooper Donna Jane Watts, by and through undersigned Counsel, and files this Response to Defendants Abboud's and Pemberton's Motion to Dismiss:

**I.  THE DRIVERS PRIVACY PROTECTION ACT IS CONSTITUTIONAL AS APPLIED TO DEFENDANTS.**

The Drivers Privacy Protection Act (DPPA) is constitutional as applied to Defendants because the information about Trooper Watts that was obtained in violation of the DPPA relates to interstate commerce. As the U.S. Supreme Court stated:

> The motor vehicle information which the States have historically sold is used by insurers, manufacturers, direct marketers, and others engaged in interstate commerce to contact drivers with customized solicitations. The information is also used in the stream of interstate commerce by various public and private entities for matters related to interstate motoring. Because drivers' information is, in this context, an article of commerce, its sale or release into the interstate stream of business is sufficient to support congressional regulation. We therefore need not address the Government's alternative argument that the States' individual, intrastate activities in gathering, maintaining, and distributing drivers' personal information has a sufficiently substantial impact on interstate commerce to create a constitutional base for federal legislation.

*Reno v. Condon*, 528 U.S. 141, 148-49 (2000). Here, Trooper Watts, as a Trooper with the Florida Highway Patrol, is involved with the regulation of interstate commerce on a daily basis while patrolling and enforcing laws on the State of Florida's major highways. In fact, the incident to which some law enforcement officers took umbrage occurred on a highway in Broward County with a speed limit of up to 70 MPH; necessarily, a major artery of interstate trucking, travel, and other commerce -- while Trooper Watts was engaged in regulating that interstate commerce. (Compl., § 9.) In addition, the stalking and harassment of Trooper Watts that was enabled by the unlawful access of her personal information from the Drivers and Vehicle Information Database (DAVID) further implicates interstate commerce. The Complaint alleges accessing of Trooper Watts's private information through DAVID implicates the use of computers on the internet -- and the internet is a vital mechanism of interstate commerce. (Compl., § 8, 16-18.)

Trooper Watts's information also concerns her private vehicles, residence, and telephones -- all of which can be reasonably inferred to contain vehicles, materials and services sold and conveyed through interstate commerce. *See Katzenbach V. McLung*, 379 U.S. 294 (1964) (holding that because Ollie's Barbecue restaurant utilized foodstuffs supplied through interstate commerce, the federal anti-discrimination law applied). Here, if the private information of law enforcement officers and women were to be disclosed to stalkers and others for illegitimate purposes, then it is likely that many women and law enforcement officers would not purchase or register their interstate commodities in Florida. *See Id.* at 300-01 (stating that racial discrimination in restaurant service "obviously discourages travel and obstructs interstate commerce for one can hardly travel without eating. Likewise, . . . discrimination deterred professional, as well as skilled, people from moving into areas where such practices occurred and thereby caused industry to be reluctant to establish there;" and, even if the local entity's "own contribution to the demand for a commodity may be trivial

by itself is not enough to remove it from the scope of federal regulation where its contribution, taken together with that of many others similarly situated, is far from trivial).

In addition, just because a federal law is intended to remedy social dangers or other ills, the law still is legitimate under the Commerce clause so long as it could or does substantially affect interstate commerce. "[T]he authority of Congress to keep the channels of interstate commerce free from immoral and injurious uses has been frequently sustained, and is no longer open to question. (citation omitted.)" *Heart of Atlanta Motel, Inc., v. U.S.*, 379 U.S. 241, 256 (1964) (applying a federal law to a local motel, even though the law is intended to curtail racial discrimination, where the law is effectively linked to interstate commerce). Here, a major purpose of the DPPA is to prevent stalking and harassment -- specifically stalkers of women and law enforcement officers -- by denying stalkers and other harassers access to personal information:

> [I]t is clear that safety and security concerns associated with excessive disclosures of personal information held by the State in motor vehicle records were the primary issue to be remedied by the legislation. See, e.g., 140 Cong. Rec. H2526 (daily ed. Apr. 20, 1994) (statement of Rep. Porter Goss) ("The intent of this legislation is simple—to protect the personal privacy and safety of all American licensed drivers."). In hearings held in the House Subcommittee on Civil and Constitutional Rights, numerous witnesses testified regarding the grave consequences of open access to government records of personal information. Not surprisingly, many witnesses mentioned the murder of an actress, Rebecca Schaeffer, by a stalker who had obtained her unlisted home address through the California DMV, a crime that was viewed as a catalyst for both state law privacy protections and the DPPA itself. Other witnesses testified about the impact of the availability of DMV records on the safety of domestic violence victims and law enforcement officers and their families targeted for retribution. . . . The bill, it seems, was viewed predominantly as a public safety measure.

*Senne v. Village of Palatine, Ill.*, 695 F.3d 597, 607 (7th Cir. 2012) (en banc) (footnotes omitted). *See Katzenbach*, 379 U.S. at 303-04 (holding that where legislators, in light of the facts and testimony before them, have a rational basis for finding a chosen regulatory scheme necessary to the protection of commerce, our investigation is at an end). In the analogous areas of sexual and racial

harassment and other forms of discrimination, Congress long has established constitutional bases under the Commerce Clause and otherwise to pass laws outlawing sexual and racial harassment by municipalities and localized businesses.  See, e.g., Title VII, 42 U.S.C. 2000E, et seq.; *Heart of Atlanta Motel, Inc.*, 379 U.S. 241;  *Katzenbach*, 379 U.S. 294.

      Additionally, the DPPA is constitutional as applied under the Necessary and Proper clause, under the Fourteenth Amendments Due Process and Equal Protection clauses, and under the Constitution's right to privacy.  For instance, it is necessary and proper to prevent municipalities from violating those rights of Trooper Watts and other citizens by illegitimately obtaining, disclosing, or using the citizens' private information because failure to prevent the municipalities from doing so likely would render the DPPA ineffective.  See also National Aeronautics and Space Administration v. Nelson, 131 S. Ct. 746 (2011) (stating that ""a "statutory or regulatory duty to avoid unwarranted disclosures" generally allays privacy concerns created by government "accumulation" of "personal information" for public purposes")  Judge Antoon's ruling in *Ela v. Orange County Sheriff's Office*, Case No. 6:13-cv-491-Orl-28KRS (M.D. Fla.  January 29, 2014), on the constitutionality of the DPPA is based in part on these considerations.  *Id.* at *8-*11.

      Defendants' reliance on *United States v. Lopez*, 514 U.S., 549 (1995), is unavailing because the scope of that federal law at issue was limited to gun possession near local school zones, and that such a limited scope obliterated the economic nexus to interstate commerce.  *See Id.* at 556-57 (quotation omitted).  Similarly, the Court in *United States v. Morrison*, 529 U.S. 598 (2000), expressly utilized the *Lopez* rationale to invalidate the Violence Against Women Act, holding: "Gender-motivated crimes of violence are not, in any sense of the phrase, economic activity"  529 U.S. at 613; and, that Congress cannot "regulate non-economic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce." 529 U.S. at 617.  Conversely, the

DPPA is not based solely on violent crime or solely on non-economic conduct's aggregate effect on interstate commerce; instead, the DPPA regulates information that affects the sale and use of motor vehicles and other items used in interstate commerce, and the information itself which may be used in interstate commerce, and the information might be misused anywhere throughout the United States.  Also, neither the Lopez nor Morrison Courts analyzed the laws at issue in those cases under the Commerce clause categories where "Congress may regulate the use of the channels of interstate commerce, or where Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities." 514 U.S. at 558.  As shown in Plaintiff's arguments above, the DPPA is valid under the Commerce clause under all categories.

Finally, one important observation in the *Lopez* opinion that supports the application of the DPPA to the City is that the Court can "invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds." 514 U.S. at 568, 577-78 (Kennedy, J., concurring).  Here, the City has failed to make any showing, much less a plain showing, that the DPPA exceeds Congress's constitutional bounds.  Thus, denial of Defendants' Motion on the grounds of as-applied constitutionality is warranted.

II. **DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY AS TO TROOPER WATTS'S CLAIM UNDER SECTION 1983.**

While Plaintiff contends that Trooper Watts's right to be free from unreasonable searches and her right to privacy form constitutional grounds for a Section 1983 claim, undersigned Counsel concedes that he cannot find case law to disqualify the individual Defendants from qualified immunity on the Section 1983 claim. Nonetheless, because Trooper Watts's Section 1983 claim also is based on her "other federal rights"; i.e., the DPPA; her Section 1983 claim stands against the individual Defendants.  *See Collier v. Dickinson*, 477 F.3d 1306, 1310-11 (11th Cir. 2007) (holding

that the DPPA provides a basis for Section 1983 claims). Like the instant case, *Collier* concerned a woman whose private information was accessed by the defendants in that case for malicious, non-commercial use, and this law prohibiting such use was clearly established years before Defendants Abboud and Pemberton accessed Trooper Watts's private information from DAVID. Thus, at least regarding the Section 1983 claim based on the DPPA, Defendants are not entitled to qualified immunity. Therefore, denial of the Motion on this claim is appropriate.

### III.   THE COMPLAINT ADEQUATELY STATES A CLAIM FOR COMMON LAW INVASION OF PRIVACY.

Count IV adequately states Trooper Watts's claim for common law invasion of privacy. The Motion argues that "Plaintiff has not alleged any intrusion into her private quarters by Defendants, but the Complaint alleges that Trooper Watts's privacy was invaded electronically, and included the private information about her physical domains of home and vehicle.

The Motion next argues that Trooper Watts has no reasonable expectation of privacy in her driver's license records. However, the allegations of Count IV implicate Trooper Watts's fundamental rights, such as intimate aspects of her life, including marriage. The data includes Trooper Watts's color photograph or image, Social Security number, date of birth, state of birth, prior and current home addresses, emergency contacts, and those contacts private and highly-restricted personal information. (Compl., ¶ 7-8, 29.) The proper inference, reinforced by the DPPA, is that those data concern many intimate aspects of a person's life. Another reasonable inference is the contact information is likely to reveal details about Trooper Watts's marital status and her spouse's, parents's, children's, and/or intimate associate's personal information. As discussed in Section I above, Congress considered that maintaining the privacy of this data may be crucial to the safety of women and law enforcement officers; and, by logical extension, to their friends and family; against stalkers and others intent on harm.

Here, as a matter of law under the DPPA, Trooper Watts's data was not accessed in the ordinary course of business because the access was in violation of the DPPA; i.e., Defendants did not had a legitimate reason to access Trooper Watts's data.

Furthermore, to the extend the "ordinary course of business" analogy to Trooper Watts's DPPA-protected data would mean that just because a doctor's staff has access to a patient's medical records means that HIPPA is toothless and that the patient has no right to privacy regarding her medical records. Or, despite Congress's recent tightening of the Patriot Act, U.S. citizens would have no expectation of privacy in their telephone records accessed by their telephone company's employees in the ordinary course of business. In actuality, Trooper Watts has and other U.S. citizens have reasonable expectations in very many records that are accessed by government and other employees in the ordinary course of business -- including certain records accessed by court, accountant, and law office staff in the ordinary course of their respective businesses. Additionally, analogous to a person's legal and reasonable expectation that police not improperly search her safe deposit box in a bank, she has a similar expectation -- codified by the DPPA and reinforced by modern precautions against identity theft -- that her highly personal and economically valuable information entrusted to the State of Florida not be improperly searched by the City. Additionally, Count IV alleges: "Defendants invaded Trooper Watts's privacy by accessing her private information on the DAVID system without a lawful purpose and without her knowledge or consent." (Compl., ¶ 50.) Like a home safe or desk drawer, Trooper Watts has a reasonable expectation that Defendants would not access her restricted information without a search warrant or other legal basis. Thus, denial of the Motion regarding this Count is appropriate.

## Conclusion

Denial of the Motion is warranted in its entirety. To the extent that the Motion is granted, Plaintiff requests leave to amend.

**CERTIFICATE OF SERVICE**

      I certify that on this Eighth day of October, 2015, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to: STEPHEN J. POWELL, Attorney for Defendant City of Jacksonville; OFFICE OF GENERAL COUNSEL CITY OF JACKSONVILLE; 117 West Duval Street, Suite 480; Jacksonville, Florida 32202; spowell @coj.net; and, to: ROBERT D. KLAUSNER and PAUL A. DARAGJATI, Counsel for individual Defendants; KLAUSNER, KAUFMAN, JENSEN & LEVINSON, P.A., 7080 N.W. 4th Street, Plantation, Florida 33317.

Respectfully submitted by:

s/ Mark E. Tietig

Mark E. Tietig, Trial Counsel
Fla. Bar No. 105465
Tietig & Tietig, P.A.
6065 South Tropical Trail
Merritt Island, FL 32952
(321) 452-9944
Facsimile: (321) 452-6960
mt@tietig.com
Attorney for Plaintiff